# Illinois Official Reports

## Appellate Court

*Yarbrough v. Northwestern Memorial Hospital*, 2016 IL App (1st) 141585

| | |
|---|---|
| Appellate Court Caption | CHRISTINA YARBROUGH and DAVID GOODPASTER, on Behalf of Hayley Joe Goodpaster, a Minor, Plaintiffs-Appellees, v. NORTHWESTERN MEMORIAL HOSPITAL and NORTHWESTERN MEDICAL FACULTY FOUNDATION, Defendants (Northwestern Memorial Hospital, Defendant-Appellant). |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-1585 |
| Filed | August 19, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-L-296; the Hon. William Gomolinski, Judge, presiding. |
| Judgment | Certified question answered; cause remanded. |
| Counsel on Appeal | Swanson, Martin & Bell, LLP, of Chicago (Kay L. Schichtel and Catherine Basque Weiler, of counsel), for appellant.<br><br>Janet, Jenner & Suggs, LLC, of Baltimore, Maryland (Hal J. Kleinman and Giles H. Manley, of counsel), for appellees. |
| Panel | JUSTICE BURKE delivered the judgment of the court, with opinion.<br>Presiding Justice Reyes and Justice Gordon concurred in the judgment and opinion. |

**OPINION**

¶ 1    This interlocutory appeal arises from a medical negligence action that plaintiffs Christina Yarbrough and David Goodpaster brought against Northwestern Memorial Hospital (NMH) and Northwestern Medical Faculty Foundation (NMFF), stemming from the premature birth of their daughter, Hayley Joe Goodpaster. NMH filed a partial motion for summary judgment, which the trial court denied. NMH requested that the trial court certify a question of law pursuant to Illinois Supreme Court Rule 308 (eff. Feb. 26, 2010) regarding the doctrine of apparent authority in the medical negligence context. The trial court ultimately issued a certified question *sua sponte*. Following this court's denial of NMH's subsequent petition for leave to appeal, the Illinois Supreme Court directed us to consider the question certified by the trial court as follows:

> "Can a hospital be held vicariously liable under the doctrine of apparent agency set forth in *Gilbert v. Sycamore Mun. Hosp.*, 156 Ill. 2d 511 (Ill. 1993), and its progeny for the acts of the employees of an unrelated, independent clinic that is not a party to the present litigation?"

¶ 2    For the reasons that follow, we answer the question in the affirmative.

## I. BACKGROUND

¶ 4    We begin by setting forth the facts to the extent necessary to address the issues on appeal. In this endeavor, we rely on the pleadings, motions for summary judgment, and associated briefing, and the discovery evidence contained in the record on appeal.

¶ 5    Plaintiffs alleged that Yarbrough, believing she was pregnant, went to Erie Family Health Center, Inc. (Erie), a federally funded, not-for-profit clinic, on November 14, 2005, after searching the Internet for a nearby clinic offering free pregnancy testing. After receiving a positive pregnancy test, healthcare workers at Erie inquired where Yarbrough would receive prenatal care. Yarbrough was advised that if she obtained prenatal care from Erie, she would deliver at NMH and receive additional testing and care at NMH, including ultrasounds. She was given pamphlet and flyer information regarding scheduling tours and classes at NMH. Plaintiffs alleged that based on her knowledge of NMH's reputation and the information provided by Erie, Yarbrough believed that if she received prenatal care from Erie, she would be receiving treatment from NMH health care workers.

¶ 6    Plaintiffs alleged that when Yarbrough was eight weeks pregnant, she experienced vaginal bleeding and went to the Advocate Illinois Masonic Medical Center (Advocate) on November 30, 2005. An ultrasound was performed and she was diagnosed with having a bicornuate uterus. The emergency department notified Erie. Yarbrough received an ultrasound at Erie on December 2, 2005, and she was told that she had a shortened cervix but did not have a bicornuate uterus. No other follow-up regarding a uterine abnormality was performed. She continued receiving prenatal care at Erie. She also received a 20-week ultrasound on February 21, 2006, at NMH, which was interpreted by Dr. William Grobman. Plaintiffs alleged that as a result of the failure to identify and address appropriately Yarbrough's bicornuate uterus and shortened cervix, she delivered Haley Goodpaster prematurely at 26 weeks' gestation on April 8, 2006, via emergency cesarean section. As a result of the premature delivery, Hayley Goodpaster suffered numerous medical complications.

¶ 7    Plaintiffs filed their initial complaint on December 28, 2009. Count I alleged medical negligence by Dr. Grobman, as an actual or apparent agent of NMFF, in performing and interpreting Yarbrough's 20-week ultrasound. Count II alleged medical negligence against NMH based on the prenatal care Yarbrough was provided at Erie, asserting that Erie was NMH's actual or apparent agent. NMH moved for summary judgment. The trial court granted the motion as to all claims related to Erie as NMH's agent. The trial court granted plaintiffs leave to file an amended complaint.

¶ 8    In the amended complaint filed on August 22, 2013, plaintiffs again alleged medical negligence against NMFF in count I based on Dr. Grobman's conduct.[1] In count II, plaintiffs alleged medical negligence against NMH based on the doctrine of apparent authority. Plaintiffs alleged that health care providers at Erie (Dr. Raymond Suarez, Dr. Virgil Reid, Janet Ferguson, CNM, and Elizabeth O. McKelvey, CNM) were the apparent agents of NMH and rendered negligent prenatal care in failing to properly scan, diagnose, and treat Yarbrough for a shortened cervix and bicornuate uterus, leading to preterm delivery.

¶ 9    In support of their apparent authority claim, plaintiffs set forth numerous allegations regarding the close ties between NMH and Erie in order to satisfy the elements of *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 524-25 (1993).[2] Plaintiffs alleged that Erie was founded as a project between NMH and Erie Neighborhood House in 1957, and NMH provides financial support, technological assistance, and strategic support through board membership. Plaintiffs alleged that in 1998, NMH's parent company, Northwestern Memorial Corporation (NMC) (now Northwestern Memorial HealthCare (NMHC)) and Erie entered into an "Affiliation Agreement" with the stated purpose of increasing NMC's "services to the community, building on our current substantial commitments and partnerships" and to "provide clarity and continuity to the historical relationship between the Parties." The agreement called for Erie to utilize NMH as a "primary site for acute and specialized hospital care for its patient population," and NMC would arrange to treat Erie patients in need of more comprehensive care. Further, plaintiffs alleged that the agreement provided for joint marketing efforts, a board seat designated for an NMH representative, committee participation, and consideration of Erie providers for medical staff membership at NMH.

¶ 10   Plaintiffs further alleged that NMH held out Erie as its agent in its published materials and on its website. Plaintiffs alleged that NMHC published annual reports and community service reports that discussed Erie. For example, plaintiffs alleged that the 2005 community service

---

[1]Plaintiffs' claim relating to Dr. Grobman is not at issue on appeal.

[2]"[U]nder the doctrine of apparent authority, a hospital can be held vicariously liable for the negligent acts of a physician providing care at the hospital, regardless of whether the physician is an independent contractor, unless the patient knows, or should have known, that the physician is an independent contractor. The elements of the action have been set out as follows:

'For a hospital to be liable under the doctrine of apparent authority, a plaintiff must show that: (1) the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital; (2) where the acts of the agent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in them; and (3) the plaintiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence.' " *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 524-25 (1993) (quoting *Pamperin v. Trinity Memorial Hospital*, 423 N.W.2d 848, 856 (Wis. 1988)).

report stated that NMHC improves access to health care "[t]hrough partnerships with community health centers"; it was committed to the community and to building "collaborative relationships with a number of neighborhood based centers"; Northwestern Memorial Foundation granted $1 million annually to the hospital's "Community Service Expansion Project," which "provides key funding for *** [Erie] sites on the West and Northwest sides"; and the project funded facility improvements and physician salaries. It stated that Erie physicians were "affiliated with Northwestern Medical Faculty Foundation, a multispecialty group practice with more than 500 physicians covering more than 40 specialties." The 2005 report included a statement from an Erie patient who was treated by an obstetrician who led "Woman's Health at Erie" and was on staff at NMH. Further, the report discussed its "longstanding affiliations with community-based health centers" in ensuring that patients "have access to quality primary and specialty care regardless of their ability to pay" and that it has "shared a relationship with Erie Family Health Center for more than 45 years." Plaintiffs alleged that the 2006 community service report stated that "Northwestern Memorial, in collaboration with [Erie] has provided the information technology infrastructure, educational tools and access to facilities with mammography equipment" and that 11.2% of the babies delivered at NMH's Prentice Women's Hospital in 2006 received prenatal care at Erie.

¶ 11 With regard to NMH's website, plaintiffs alleged that NMH listed Erie under "Our Health Partners," along with a link to Erie's website, and promoted that it has a "formal and long-standing" affiliation with Erie, including two members on Erie's board of directors. Plaintiffs alleged that Erie's website similarly promoted its relationship with NMH and stated that it "partners with Northwestern Memorial Hospital *** to increase access to specialized medical care and state-of-the-art medical technologies. Patients who are in need of services not offered at Erie are eligible to receive care at these hospitals." Further, Erie's website stated that all Erie doctors "have faculty status at Northwestern University Feinberg School of Medicine." Plaintiffs alleged that NMH was aware of Erie's website but did not monitor or review it and never instructed Erie to change it.

¶ 12 NMH moved for partial summary judgment as to all apparent authority claims related to the alleged negligence of employees or agents of Erie. NMH argued that NMH did not hold out Erie as its agent and Erie and its employees did not hold themselves out as agents of NMH. NMH asserted that Erie was an independent, federally funded community health center comprised of 10 clinics in the Chicago area, it was not named as a defendant, and Erie's employees were working onsite at Erie within the scope of their employment with Erie. NMH argued that neither it nor Erie represented that Erie was an outpatient facility of NMH and there was no legal partnership or joint marketing efforts. NMH asserted that Erie has its own management structure, budget, board of directors, employees, and facility. NMH asserted that although it provides some charitable funding to Erie and has a small presence on its board, NMH has no control over Erie.

¶ 13 In support of its argument that there was no evidence of an apparent agency relationship between NMH and Erie, NMH relied on the deposition testimony of Holli Salls, vice president of public relations for NMH; Doctor Daniel Derman, vice president of operations at NMH; William Kistner, vice president of internal audit for NMHC; and Yarbrough. Salls testified that NMH does not bring pamphlets about NMH to independent medical groups to distribute to their patients, NMH did not do any joint marketing with other entities between 2004 and 2006, and Erie has never sought to do any joint promotional marketing. Salls testified that she was

aware that Erie discussed its affiliation with NMH on its website. Salls testified that Erie did not get her permission to do so, but NMH has never told Erie not to promote the affiliation between them. Salls testified that use of the word "partner" in promotional materials was not meant in the legal sense, but merely described collaborative activities.

¶ 14 Dr. Derman acknowledged in his deposition that NMH's website stated that NMH had "formal and long-standing affiliations with two federally qualified health center partners, Near North Health Services Corporation and Erie Family Health Center" and that it had two representatives on Erie's board of directors. Further, NMH's website listed Erie under "Our Health Partners" and stated that Erie "was founded in 1956 as a project of volunteer physicians from Northwestern Memorial and Erie Neighborhood." Dr. Derman also acknowledged NMH's press releases discussing NMH's partnership initiatives with Erie in treating diabetes and women's health, promoting the fact that NMH and Erie "worked together to provide information about transportation, navigating and processes for accessing additional diagnostic services if needed," and developing educations programs together. Dr. Derman acknowledged that Erie's website listed NMH under "Our Partners" and "Hospital Affiliations" and it stated that "Erie partners with" NMH, among other hospitals, "to increase access to specialized medical care and state-of-the-art medical technologies. Patients who are in need of services not offered at Erie are eligible to receive care at these hospitals." Further, Derman acknowledged that Erie's website stated, "All Erie pediatricians, internists, OB/GYN physicians and family physicians have faculty status at Northwestern University Feinberg School of Medicine," and that medical students and residents from Northwestern train at Erie. Dr. Derman testified that he was aware that Erie has a website, but his office does not review the information on Erie's website.

¶ 15 Dr. Derman reviewed the affiliation agreement during his deposition and acknowledged that, in it, NMC agreed to cause NMH to consider Erie staff for hospital privileges. Further, the parties agreed to "jointly participate in collective marketing efforts as they relate to the affiliation of the parties" and that the other party "may publicize and refer to this affiliation agreement and their affiliation with each other with the prior consent of the other party." The agreement also contained an "independent contractor" provision indicating that the parties did not have a joint venture, partnership, or employer/employee relationship.

¶ 16 Dr. Derman testified that NMH does not employ Erie staff and does not provide Erie with any equipment or supplies, lab coats, or promotional material. Dr. Derman testified that NMH makes charitable contributions to Erie of approximately $333,000 and $600,000 per year, passes along grant money, and does not charge Erie patients for care given at NMH. Derman testified that NMH makes charitable contributions to Erie and other organizations because "we're just good community members and we try to support other people that are doing good in the community." NMH has also provided Erie with free informational technology support services.

¶ 17 Kistner testified in his deposition that he has served on Erie's board of directors since 2002, and he was the chairman for two years. At one point, there was a second NMHC representative on the board. Kistner explained that as indicated in the affiliation agreement, Erie must follow specific guidelines to satisfy Federally Qualified Health Center (FQHC) governance requirements, which requires 51% or more of the board to be composed of patients and community members, while the remaining 49% may be nonpatients, but "no more than 50 percent of the 49 percent can derive more than 10 percent of their income from the healthcare

field." He signed a conflict of interest statement indicating that his fiduciary responsibility was to Erie when acting as a board member. He testified that Erie operates as an independent entity and its community board members are "very vocal." Kistner testified that he could not recall any collective marketing efforts in the 10 years of his board membership. Kistner testified that in 2006, Erie's revenue was approximately $25 million; approximately 60% came from patient revenue and 40% came from grants from various organizations, including NMH or NMC.

¶ 18    Yarbrough testified in her deposition that she found Erie by searching the Internet for a clinic where she could obtain a pregnancy test without having health insurance. When the test was positive, someone at Erie asked what her plans were for prenatal care. Yarbrough testified that she "asked questions about the doctors there, what hospital I would be going to, things like that. That's when I chose Erie Family Clinic." The Erie clinic was approximately five blocks from where she lived at the time. She filled out paperwork for Medicaid and scheduled her first appointment. She was also given written materials or a pamphlet about Erie. She testified that she was informed that she "would have ultrasounds done at Women's Prentice Hospital, which is part of Northwestern, and that's where I would most likely deliver the baby."

> "Q. Did anybody at Erie say anything to suggest to you that Erie Family Health Center and Northwestern Memorial Hospital were the same entity?
>
> A. I was under the impression that they were.
>
> Q. And what would give you that impression?
>
> A. Most likely because of the delivery at Northwestern, the delivery privileges.
>
> Q. So that if you had gone to Dr. Smith whose office was on Michigan Avenue and you were told you would most likely deliver at Northwestern, would you have drawn the inference that Dr. Smith's practice and Northwestern were actually the same entity?
>
> A. Yes.
>
> Q. But in terms of whether anybody at Erie said, hey, we are Northwestern and Northwestern is part of us, fair to say nobody said anything like that?
>
> A. No one said that, but they also never said that they weren't."

¶ 19    Yarbrough testified that after being treated for vaginal bleeding at Advocate on November 30, 2005, and being diagnosed with a bicornuate uterus, she went to Erie on December 2, 2005, where she saw Dr. Suarez and midwife McKelvey. Dr. Suarez performed an ultrasound and informed her that she did not have a bicornuate uterus. She was told that she had a shortened cervix. Yarbrough returned to Erie several times after that for routine appointments, a urinary tract infection, and a lab test. She had the routine 20-week ultrasound performed at NMH on February 21, 2006, and she continued with her regular prenatal visits at Erie after that. Yarbrough testified that on April 5, 2006, she experienced severe cramps and back pain. She called Erie and was told to go to NMH. She was admitted to the hospital and delivered her daughter three days later via a cesarean-section performed by Dr. Suarez. Yarbrough testified that either during the delivery or afterward, Dr. Suarez mentioned something about her having a bicornuate uterus and an incompetent cervix when Yarbrough asked why she had delivered prematurely.

¶ 20    Regarding her decision to go to Erie, Yarbrough further testified as follows:

> "Q. Early on you talked about doing some research, and you found Erie Clinic, and when you went through the first time and confirmed your pregnancy, you asked

questions and were told about the delivery at Northwestern, and you believed that they were working—they would be working together?

A. Yes.

Q. When you had your 20-week ultrasound and they sent you—when Erie sent you on to Northwestern to Prentice to have it done, did that reconfirm your belief that the two were working together?

A. Yes.

Q. Okay, and that was because you would get your complete care was all affiliated, since the ultrasound was there, the delivery was going to be there?

A. Yes.

Q. And you did not have your own o-b-g-y-n and you just went there initially at Erie to confirm your belief that you were pregnant. Once you did find out that you were pregnant, did the fact that they said that you would have the delivery and other care at Northwestern influence your decision to stay at Erie?

A. Yes."

¶ 21    Yarbrough also testified:

"Q. Did you have any particular knowledge of [NMH]?

A. I was under the impression that they were a very good hospital, very big, very well-known in the city.

Q. And I assume that if you had been living on the south side and you had gone to a physician's office and they said, you know, we are likely to deliver you at Christ Hospital, you would have been happy about that as well?

A. Yes.

Q. Okay. So, you know, any good hospital would sound good to you?

A. Yes.

Q. Did anybody at [NMH], flipping this around, say anything to you to suggest that [NMH] and Erie Family Health Center had some special connection?

A. No."

¶ 22    Based on this testimony, NHM argued that Yarbrough was never told that NMH and Erie were the same entity and the fact that she was informed she would likely deliver at NMH was insufficient to establish apparent authority. Further, Yarbrough was not seeking treatment from NMH as she had no specific desire to deliver at NMH and "any good hospital would sound good to" her. NMH contended that plaintiffs' claim would require a massive expansion of the apparent authority doctrine under *Gilbert*, and plaintiffs could not show that NMH held Erie out as its apparent agent, that NMH acquiesced to any holding out by Erie, or any reasonable reliance by Yarbrough. NMH asserted that Yarbrough sought care from Erie and all of the treatment Erie provided was performed at Erie's facility.

¶ 23    Plaintiffs responded that Yarbrough agreed to receive prenatal treatment at Erie based on her knowledge of NMH and after being led to believe, reasonably, that the Erie health care workers were employees or agents of NMH. Plaintiffs contended that her belief was reasonable because Erie staff informed her that she would deliver and have ultrasounds performed at NMH, she was provided pamphlets with information about delivering at NMH, she knew NMH had a very good reputation, and she was never told that the doctors and nurses

at Erie were not employees or agents of NMH. Plaintiffs asserted that NMH promoted itself as a provider in partnership with Erie under the affiliation agreement, in its press releases, and on its website, and it did not prevent Erie from discussing its affiliation with NMH on Erie's website.

¶ 24 At a hearing on the motion for summary judgment on February 21, 2014, NMH orally moved to certify a question under Rule 308. The circuit court stated that the case was "the first of its kind" and it entered an order denying NMH's partial summary judgment motion and ordering the parties to submit proposed certified questions.

¶ 25 Following their respective submissions, the circuit court took the matter under advisement. According to NMH, the circuit court decided not to certify a question but did not enter an order to that effect. On May 16, 2014, the circuit court *sua sponte* entered an order certifying the question set forth *supra*, pursuant to Rule 308, and holding that its February 21, 2014, order "involves a question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." At our supreme court's direction, we allowed NMH's petition for leave to appeal on January 14, 2015.

¶ 26                                    II. ANALYSIS
¶ 27                              A. The Certified Question
¶ 28 As set forth above, the certified question is as follows:

> "Can a hospital be held vicariously liable under the doctrine of apparent agency set forth in *Gilbert v. Sycamore Mun. Hosp.*, 156 Ill. 2d 511 (Ill. 1993), and its progeny for the acts of the employees of an unrelated, independent clinic that is not a party to the present litigation?"

¶ 29                              B. Standard of Review
¶ 30 "The scope of review in an interlocutory appeal under Rule 308 is ordinarily limited to the question certified by the trial court, which is reviewed *de novo*." *Kennedy v. Grimsley*, 361 Ill. App. 3d 511, 513 (2005) (citing *Thompson v. Gordon*, 356 Ill. App. 3d 447 (2005)). Rule 308(a) provides in relevant part that the trial court may certify a question to this court when, "in making an interlocutory order not otherwise appealable, finds that the order involves a question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." Ill. S. Ct. R. 308(a) (eff. Feb. 26, 2010).

¶ 31                       C. *Gilbert v. Sycamore Municipal Hospital*
¶ 32 The parties agree that under *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 525 (1993), a hospital may be vicariously liable for negligent medical treatment rendered in the hospital by an independent-contractor physician under the doctrine of apparent authority. *Id.* at 524. Before our supreme court decided *Gilbert*, "hospitals in Illinois could be subject to vicarious liability for a physician's negligent acts only if the physician was an actual agent of the hospital." *Lamb-Rosenfeldt v. Burke Medical Group, Ltd.*, 2012 IL App (1st) 101558, ¶ 24. The court cited the "realities of modern hospital care" as its impetus for allowing hospitals to be vicariously liable under the doctrine of apparent authority. The court observed that hospitals

"increasingly hold themselves out to the public in expensive advertising campaigns as offering and rendering quality health services," and spend "billions of dollars marketing themselves, nurturing the image with the consuming public that they are full-care modern health facilities" in order to attract patients and compete for health care dollars. (Internal quotation marks omitted.) *Gilbert*, 156 Ill. 2d at 520. Further, the public is generally unaware of whether the staff in an emergency room is comprised of independent contractors or employees of the hospital, and absent a situation where a patient is somehow put on notice of a doctor's independent status, a patient generally relies on the reputation of the hospital and reasonably assumes that the staff is comprised of hospital employees. *Id.* at 521.

¶ 33　　With these concerns in mind, the *Gilbert* court held that a plaintiff must establish the following three factors to hold a hospital liable under the doctrine of apparent authority for acts of independent-contractor physicians:

> " '(1) the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital; (2) where the acts of the agent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in them; and (3) the plaintiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence.' " *Id.* at 525 (quoting *Pamperin v. Trinity Memorial Hospital*, 423 N.W.2d at 856).

¶ 34　　The first two elements are "frequently grouped together and have been referred to as the 'holding out' factor." *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶ 26. A plaintiff must present some evidence of all three elements in order to avoid summary judgment. *Wallace v. Alexian Brothers Medical Center*, 389 Ill. App. 3d 1081, 1094 (2009); *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶ 25. The *Gilbert* court stressed that "liability attaches to the hospital only where the treating physician is the apparent or ostensible agent of the hospital. If the patient knows, or should have known, that the treating physician is an independent contractor, then the hospital will not be liable." *Gilbert*, 156 Ill. 2d at 522.

¶ 35　　　　　　　D. Application of *Gilbert* Outside the "Four Walls" of a Hospital

¶ 36　　On appeal, NMH first contends that the doctrine of apparent authority is not applicable here because the conduct at issue did not occur at the hospital but instead occurred, as indicated in the certified question, at an "unrelated, independent clinic."

¶ 37　　As this court in *Malanowski v. Jabamoni* observed, the negligent conduct in *Gilbert* occurred in the emergency room of a hospital. *Malanowski v. Jabamoni*, 293 Ill. App. 3d 720, 727 (1997); *Gilbert*, 156 Ill. 2d at 516-17. Accordingly, the particular facts in *Gilbert* necessarily confined the court's analysis to medical negligence occurring in an emergency room. *Malanowski*, 293 Ill. App. 3d at 727; *Gilbert*, 156 Ill. 2d at 516-17. The *Malanowski* court reasoned that there was

> "nothing in the *Gilbert* opinion that would bar a plaintiff, who could otherwise satisfy the elements for a claim based on apparent agency, from recovering against a hospital merely because the negligent conduct of the physician did not occur in the emergency room or some other area within the four walls of the hospital." *Malanowski*, 293 Ill. App. 3d at 727.

¶ 38    In *Malanowski*, the allegedly negligent conduct occurred in an outpatient clinic owned and operated by Loyola University of Chicago (Loyola) called the "Loyola University Mulcahy Outpatient Center." *Id.* at 722. The plaintiff brought suit against Loyola and Dr. Reena Jabamoni, alleging that Dr. Jabamoni negligently failed to diagnose the decedent's breast cancer while treating her at the outpatient clinic. *Id.* In her apparent authority claims, the plaintiff alleged that Loyola owned and operated the outpatient center, which held itself out as a "direct provider of health care services"; that the decedent had been a regular patient of the clinic since 1982; that the decedent had been a regular patient of Dr. Jabamoni for several years; and that she reasonably believed that Dr. Jabamoni was an employee of the outpatient center, when in fact she was an independent contractor with privileges at the center. *Id.* at 726.

¶ 39    In arguing on appeal that the trial court properly dismissed the apparent authority claims, Loyola contended that *Gilbert* did not apply because the conduct occurred outside of the hospital, but the court found that "[i]f, as plaintiff maintains, Loyola's conduct reasonably led [the patient] to rely upon 'Loyola' for treatment, rather than any particular physician, then plaintiff should be allowed recovery for damages caused thereby." *Id.* at 727. The court also found that under *Gilbert*, the existence of an ongoing doctor-patient relationship did not preclude a claim of reliance on the hospital, and remained a question of fact for the jury to resolve. *Id.* at 728. The court observed that the outpatient center bore Loyola's name, it held itself out as a direct provider of health care services, it had introduced the decedent to Dr. Jabamoni, the decedent was also treated by other physicians at the center, and payment for Dr. Jabamoni's services were made to the outpatient center. *Id.* See also *Butkiewicz v. Loyola University Medical Center*, 311 Ill. App. 3d 508, 510-11 (2000) (holding that *Gilbert* was not limited to conduct in an emergency room where the independent-contractor radiologist failed to diagnose the decedent's lung cancer after his admission to the hospital for chest pains), and *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 151-52 (2006) (applying *Gilbert* to negligent medical conduct that occurred outside of the emergency room, *i.e.*, in the hospital's operating room).

¶ 40    NMH argues that *Malanowski* is distinguishable because Erie is a separate corporate entity contained in a separate facility, and not a separate corporate entity located within an outpatient facility owned and operated by NMH, as in *Malanowski*. However, plaintiffs' claim is that there were such close ties between NMH and Erie, despite being separate entities located in separate facilities, that material issues of fact exist regarding the elements of apparent authority. Based on *Malanowski*, *York*, and *Butkiewicz*, we reject NMH's argument that *Gilbert* is inapplicable here because the allegedly negligent conduct did not occur within the "four walls" of the hospital. As the court in *Malanowski* found, nothing in the *Gilbert* opinion limits a plaintiff from recovering against a hospital "merely because the negligent conduct of the physician did not occur in the emergency room or some other area within the four walls of the hospital." *Malanowski*, 293 Ill. App. 3d at 727. The key determinant for recovery under *Gilbert* is whether the plaintiff can show that the hospital's "conduct led [the plaintiff] to reply upon ['the hospital'] for treatment, rather than on any particular physician." *Id.* This is precisely what plaintiffs aim to show in this case.

¶ 41    NMH also cites *Scardina v. Alexian Brothers Medical Center*, 308 Ill. App. 3d 359, 365 (1999), in support of its argument. However, the brief passage cited by NMH from *Scardina* merely summarizes the holding in *Gilbert*: "In *Gilbert*, the court held that a hospital can be vicariously liable under the doctrine of apparent agency for the negligent acts of a physician

providing care at the hospital, irrespective of whether the physician is an independent contractor." *Id.* at 363. Notably, the *Scardina* court observed that "although *Gilbert* speaks of negligent treatment rendered in a hospital's emergency room, its decision is not limited to such factual settings, but applies to cases involving other forms of hospital care." *Id.* at 364. As in *Butkiewicz* and *York*, the alleged medical negligence in *Scardina* occurred in the hospital (an operating room), but not in the emergency room; thus, the court had no reason to consider *Gilbert*'s applicability outside the "four walls" of a hospital. Moreover, the contested issue did not involve where the conduct occurred, but whether the patient relied on the hospital to provide radiological services upon his admission to the hospital for stomach and chest pain, where the patient went there because his family physician instructed him to go to that particular hospital and had staff privileges there. *Id.*

¶ 42　　　　　　　　E. Application of *Gilbert* Where the Apparent Agent Is Not a Defendant

¶ 43　　NMH next argues that the apparent agent, an "unrelated, independent clinic," *i.e.*, Erie, was not made a party to the litigation, and therefore NMH cannot be held liable as the principal.

¶ 44　　We conclude that *Gilbert* contains no such requirement. Although whether the apparent agent must be named as a party was not at issue in *Gilbert*, we note that the physician and the hospital were sued in *Gilbert* but not the independent medical group that employed the physician. *Gilbert*, 156 Ill. 2d at 515. Also by way of example, in *Mizyed v. Palos Community Hospital*, 2016 IL App (1st) 142790, ¶¶ 23-25, 36, neither the physician who rendered the treatment at issue nor the independent medical group that employed her were named in the plaintiff's medical negligence lawsuit, which alleged that the hospital was vicariously liable for the physician's negligence under the doctrine of actual and apparent agency.

¶ 45　　As noted by plaintiffs, the apparent agency instruction in the Illinois Pattern Jury Instructions, Civil, supports that a principal may be sued even where the apparent agent is not. The Notes on Use for instruction 105.11, "Claims Based on Apparent Agency—Principal Sued, But Not Agent," provides that "[t]his instruction should be used where the issue of apparent agency is in dispute, *the principal alone is sued*, and plaintiff alleges reliance upon a 'holding out' on the part of the principal." (Emphasis added.) Illinois Pattern Jury Instructions, Civil, No. 105.11, Notes on Use (2006) (hereinafter, IPI Civil (2006)). See also IPI Civil (2006) No. 105.10, Notes on Use ("This instruction should be used where the issue of apparent agency is in dispute, the principal and agent are sued in the same case, and plaintiff alleges reliance on a 'holding out' by the principal."); IPI Civil (2006) No. 50.04 (general apparent agency instruction where only principal is sued). Accordingly, plaintiffs were not required to name Erie or any of the Erie treaters as defendants and their absence is not a bar to recovery against the hospital here.

¶ 46　　In sum, we find that a hospital may be held liable under the doctrine of apparent agency for the acts of the employees of an independent clinic that is not a party to the litigation, assuming that the plaintiff establishes the elements of apparent authority as set forth in *Gilbert*. Courts may apply *Gilbert* outside the "four walls" of the hospital, and a plaintiff is not required to name the individual physician or his employer as a defendant in order to hold the principal/hospital vicariously liable.

F. Applying *Gilbert* to the Facts of This Case

¶ 48        NMH argues, in the alternative, that plaintiffs have failed to establish the *Gilbert* elements, *i.e.*, they have not shown that NMH held Erie out as its agent, that Erie held itself out as NMH's agent with NMH's acquiescence, or that Yarbrough reasonably relied on any holding out in electing treatment at Erie. NMH warns that an opposite conclusion would greatly expand apparent agency law in Illinois. NMH asserts that this case is "ripe" for ruling on summary judgment as there are no disputed issues of material fact and the only issue remaining is the question of law regarding apparent authority. NMH asserts that this court should answer the certified question in the negative and remand for a finding that it is entitled to partial summary judgment.

¶ 49        Plaintiffs assert that the certified question does not present a novel question and NMH's appeal merely involves questions of fact that should be determined by a jury. Plaintiffs argue that they have established material issues of fact under the *Gilbert* test as to the holding out and reasonable reliance requirements.

¶ 50        We note that the parties have engaged in extensive discovery with respect to the agency issue and NMH has expended considerable effort on appeal discussing why the facts do not support an apparent authority claim here. In essence, NMH is arguing that the trial court should have granted its motion for summary judgment. This case is before us on a Rule 308 certified question from the trial court, and not an appeal from the trial court's ruling on NMH's motion for partial summary judgment. A Rule 308 appeal focuses on answering a certified question of law and is "not intended to address the application of the law to the facts of a particular case." *Razavi v. Walkuski*, 2016 IL App (1st) 151435, ¶¶ 7, 8 (declining to address the parties' arguments regarding the underlying motion to dismiss). See also *Spears v. Association of Illinois Electric Cooperatives*, 2013 IL App (4th) 120289, ¶ 15 (stating that the court should only answer a certified question if it presents a question of law and decline to answer if the resolution depends on "a host of factual predicates" (internal quotation marks omitted)). However, even considering NMH's alternative argument, given the facts adduced in this case thus far, NMH has failed to establish that no genuine issue of material fact exists such that its right to a judgment in its favor is " 'clear and free from doubt.' " *Mizyed*, 2016 IL App (1st) 142790, ¶ 35 (quoting *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶ 23).

¶ 51        We recognize that the present case does not involve the traditional situation of an independent-contractor physician employed by a separate, private medical group, providing negligent care inside a hospital. However, plaintiffs do not seek to hold NMH liable merely because, as NMH contends, the Erie physicians have privileges at the hospital. Rather, the issue of whether NMH and/or Erie held themselves out as having such close ties such that a reasonable person would conclude that an agency relationship existed, and whether Yarbrough relied upon NMH or Erie, raises material questions of fact for a jury to resolve. Under the unique facts of this case and in light of the evidence presented thus far, plaintiffs have, at a minimum, raised a question of fact regarding the holding out and reliance elements under *Gilbert* and their apparent authority claim contains issues of fact subject to a jury's determination. As the *Gilbert* court stated, "[w]hether an agent is authorized to act is a question of fact. [Citation.] Whether a person has notice of the lack of an agent's authority, or is put on notice by circumstances, is likewise a question of fact." *Gilbert*, 156 Ill. 2d at 524. See also *Scardina*, 308 Ill. App. 3d at 363 ("Whether an agency relationship exist[ed] in such instances is typically a question of fact to be decided by the trier of fact and may only be disposed of by

summary judgment where the parties' relationship is so clear as to be undisputed."); *McNamee v. Sandore*, 373 Ill. App. 3d 636, 651 (2007) ("While agency is a legal concept, the existence and scope of an agency relationship is a fact-intensive inquiry reserved for the finder of fact unless the parties' relationship is so clear as to be undisputed.").

¶ 52    As stated, the first two elements of apparent authority require a showing that "the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital," and if the agent's acts created "the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in them." (Internal quotation marks omitted.) *Gilbert*, 156 Ill. 2d at 525. "The focus of this factor is whether or not 'the patient knows, or should have known, that the physician is an independent contractor.' " *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶ 26 (quoting *Gilbert*, 156 Ill. 2d at 524).

¶ 53    It is undisputed that NMH holds itself out as a "full service hospital." More relevant to this case, however, are the facts showing that NMH also promotes itself as a community-oriented hospital that collaborates with neighborhood centers, including Erie, to make quality health care available to those in need. NMH publicized its relationship with Erie on its website, annual reports, community service reports, and other press releases. As plaintiffs noted, NMH promoted that 11.2% of babies delivered at NMH in 2006 received prenatal care at Erie, and 100% of prenatal patients at Erie delivered at NMH. NMH's website provided a link to Erie's website and represented that Erie was one of "Our Health Partners" and promoted their "formal and long-standing affiliations" with Erie, that two NMH representatives sit on Erie's board, and that Erie was founded "as a project of volunteer physicians from Northwestern Memorial and Erie Neighborhood House." Dr. Derman testified in his deposition regarding collaborative efforts between NMH and Erie in providing care in the areas of diabetes and women's health and its promotion of these efforts. In addition, NMH has continuously contributed financially to Erie, provides information technology assistance to Erie, and does not charge Erie patients for care given at NMH.

¶ 54    Significantly, the relationship between Erie and NMH also involves the affiliation agreement, pursuant to which the parties agreed that NMH was to be the primary site for acute and specialized hospital care for Erie patients. The affiliation agreement called for a NMH representative to sit on Erie's board of directors, the creation of a community advisory committee, and appointment of Erie's executive director to the committee. Although Salls testified in her deposition that she did not know of any joint marketing efforts between NMH and Erie, the affiliation agreement provided for joint marketing efforts relating to their affiliation.

¶ 55    Regarding Erie's actions, which would constitute a "holding out" by Erie, Yarbrough testified that, upon confirming her pregnancy, Erie staff inquired where she planned to receive prenatal care and informed her that, if she were treated at Erie, she would likely deliver at NMH and receive additional testing at NMH and provided her with information about delivering at NMH. As testified to by Yarbrough, although no one told her that the doctors and staff at Erie were NMH employees, no one informed her that her treating doctors and staff at Erie were not a part of NMH.

¶ 56    In addition, Erie's website referred to NMH as an "Our Partner" and stated that "Erie partners with [NMH]," in addition to other hospitals, in order to "increase access to specialized medical care and state-of-the-art medical technologies. Patients who are in need of services not

offered at Erie are eligible to receive care at these hospitals." The website stated that all Erie physicians "have faculty status at Northwestern University Feinberg School of Medicine." Salls testified that she was aware that Erie discussed its affiliation with NMH on its website, but that NMH has never told Erie not to promote the affiliation between them. Dr. Derman testified that he was also aware of Erie's website, but his office does not review it.

¶ 57        Whether Yarbrough actually observed these indicia of "holding out" on the websites of NMH and Erie and in written materials is not determinative. Whether a patient actually observes a hospital's advertisements is not relevant to the objective inquiry into the "holding out" factor under *Gilbert*. *Spiegelman v. Victory Memorial Hospital*, 392 Ill. App. 3d 826, 839 (2009). In *Spiegelman*, the hospital argued that its advertisements promoting the hospital could not show reasonable reliance as there was no evidence that the plaintiff actually viewed the advertisements. *Id.* The plaintiff argued that the advertisements demonstrated that the hospital held itself out as a complete provider of care, an objective determination which did not depend on whether the plaintiff actually viewed them. *Id.* The court agreed with the plaintiff, holding that the advertisements "were relevant to the element of holding out—whether the hospital held itself out as a provider of complete medical care." *Id.* at 841. See also *Hammer v. Barth*, 2016 IL App (1st) 143066, ¶ 26 (finding that a genuine issue of material fact existed as to the "holding out" element where the evidence showed that the hospital's website advertised that the hospital had clinical leadership in over 60 medical fields and boasted a staff of over 1000 doctors in various specialties and one of the "most experienced" emergency trauma centers in Illinois).

¶ 58        NMH argues that this case does not involve the same concern present in *Spiegelman* and *Gilbert*, *i.e.*, hospitals using advertisements to attract patients by promising complete, quality care while attempting to avoid liability by using independent contractors. *Spiegelman*, 392 Ill. App. 3d at 839-41; *Gilbert*, 156 Ill. 2d at 520-21. However, as in *Spiegelman*, in holding itself out as a close partner with Erie to provide specialized and acute care to a targeted population, NMH attempted not only to be a good citizen of the community but also to attract patients. We disagree with NMH's assertion that *Spiegelman* is distinguishable or that the concerns animating *Gilbert* are not present in this case.

¶ 59        Turning to the third element in *Gilbert*, reasonable reliance is established where "the plaintiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence." (Internal quotation marks omitted.) *Gilbert*, 156 Ill. 2d at 525.

> " '[T]he critical distinction is whether the plaintiff is seeking care from the hospital itself or whether the plaintiff is looking to the hospital merely as a place for his or her personal physician to provide medical care. Except for one who seeks care from a specific physician, if a person voluntarily enters a hospital without objecting to his or her admission to the hospital, then that person is seeking care from the hospital itself. An individual who seeks care from a hospital itself, as opposed to care from his or her personal physician, accepts care from the hospital in reliance upon the fact that complete emergency room care—from blood testing to radiological readings to the endless medical support services—will be provided by the hospital through its staff.' "
> *Gilbert*, 156 Ill. 2d at 525-26 (quoting *Pamperin*, 423 N.W.2d at 857).

¶ 60        NMH asserts that plaintiffs failed to establish any reasonable reliance by Yarbrough because she sought treatment at Erie, she understood her treaters were Erie employees, no one

- 14 -

represented that Erie and NMH were the same entity, and she expressed no specific preference for any particular hospital.

¶ 61　　　　Yarbrough testified that she did not have a prior or ongoing relationship with any physicians at Erie, she had never been to Erie for any treatment before, and she did not seek out a particular physician at Erie. Her testimony indicated that she went to Erie because it was a local clinic offering free pregnancy testing. After confirming her pregnancy, Erie staff inquired about where Yarbrough planned to receive prenatal care and informed her that, if she were treated at Erie, she would likely deliver at NMH and receive additional testing, including ultrasounds, at NMH. She was given pamphlets and information about NMH by Erie. Yarbrough testified that she asked about the doctors and what hospital she would deliver at and "[t]hat's when I chose Erie Family Clinic." She testified that she was under the impression that Erie and NMH were the same entity "[m]ost likely because of the delivery at Northwestern, the delivery privileges." She confirmed that if she had gone to a different doctor's office and had been told she would most likely deliver at NMH, she would have drawn the same inference. Yarbrough testified that she believed Erie and NMH were working together. She affirmed that being sent to NMH for her 20-week ultrasound reaffirmed this belief because her complete care was "all affiliated, since the ultrasound was there, the delivery was going to be there." Yarbrough affirmed that the fact that she would deliver at NMH and receive other care there influenced her decision. Her impression of NMH was that it was "a very good hospital, very big, very well-known in the city." When asked if she "had been living on the south side and you had gone to a physician's office and they said, you know, we are likely to deliver you at Christ Hospital, you would have been happy about that as well?" Yarbrough answered, "Yes." She also responded in the affirmative when asked if "any good hospital would sound good to you?"

¶ 62　　　　Yarbrough's testimony raises an issue of material fact regarding whether there was reasonable reliance in this case. Yarbrough indicated that her decision to utilize Erie for prenatal treatment was not based on her desire to receive treatment from a particular doctor at Erie or Erie itself, but was instead based on her expressed preference for a particular hospital, *i.e.*, NMH, which she deemed to be a "very good" hospital. Her testimony also supports that she was unaware that her Erie treaters were not part of NMH; it was her understanding or perception that Erie was the same entity as, or was related to, NMH.

¶ 63　　　　Plaintiffs assert that this case is similar to *York*, where the plaintiff believed there were " 'good docs at Rush' " and, based upon this knowledge, he selected a particular orthopedic surgeon there to perform his knee replacement surgery. *York*, 222 Ill. 2d at 195-96. The court found sufficient evidence to support the jury's verdict in finding Rush vicariously liable for the negligent conduct of the anesthesiologist who participated in the plaintiff's surgery based on apparent authority. *Id.* at 195. The plaintiff did not select who would serve as his anesthesiologist; he relied on the hospital to select one for him. *Id.* at 195-98. Our supreme court's holding was based on evidence showing that the plaintiff selected the orthopedic surgeon only after determining that the hospital had good doctors and nothing alerted the plaintiff to the fact that the anesthesiologist was an independent contractor. *Id.* at 196. Our supreme court clarified the holding in *Gilbert* in observing that "the mere existence of a preexisting physician-patient relationship" did not "automatically preclude[ ] any claim by the patient of reliance upon the hospital or the support staff." *Id.* at 193. Accordingly, "the reliance element of a plaintiff's apparent agency claim is satisfied if the plaintiff reasonably relies upon

a hospital to provide medical care, rather than upon a specific physician." *Spiegelman*, 392 Ill. App. 3d at 840.

¶ 64　　In the present case, the evidence showed that Yarbrough did not have a preexisting relationship with Erie or any physician at Erie. She decided to receive prenatal treatment at Erie only after she was informed of its relationship with NMH, which she believed to be a very good hospital, similar to the plaintiff in *York*. In contrast, where a patient goes to a hospital at the direction of and in reliance on a trusted personal physician, our court has found no reasonable reliance under *Gilbert*. For example, there was no reliance established in *Butkiewicz*, where the patient went to the defendant hospital because his long-time personal physician directed him to, even though he did not like that hospital, and the patient trusted his physician completely and would have done "whatever he told him to do." *Butkiewicz*, 311 Ill. App. 3d at 510, 512-14. See also *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶¶ 33-35 (finding no evidence of reliance sufficient to avoid summary judgment where the patient went to the defendant hospital to receive treatment at the direction of her personal physician, with whom she had a preexisting relationship, and the plaintiff's negligence claim sought to hold the hospital vicariously liable for treatment protected by that physician).

¶ 65　　　　　　　　　　　　　III. CONCLUSION

¶ 66　　In sum, we answer the certified question in the affirmative. A hospital may be held liable under the doctrine of apparent agency for the acts of the employees of an independent clinic that is not a party to the litigation, assuming that the plaintiff establishes the elements of apparent authority as set forth in *Gilbert*. We remand this case for further proceedings consistent with this opinion.

¶ 67　　Certified question answered; cause remanded.