2024 IL App (1st) 221169

SIXTH DIVISION
January 5, 2024

No. 1-22-1169

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | |
|---|---|
| SHAINA SOLORZANO, | ) |
| | ) |
| Plaintiff-Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| JASON MAGNANI, M.D.; NEIL GUPTA, M.D.; | ) Appeal from the |
| NANCY SIBIGTROTH, M.D.; THE MOUNT SINAI | ) Circuit Court of |
| COMMUNITY FOUNDATION, d/b/a Sinai Medical | ) Cook County |
| Group; MOUNT SINAI HOSPITAL CENTER OF | ) |
| CHICAGO; VICTOR ROMANO, M.D.; ROMANO | ) No. 2018 L 6332 |
| ORTHOPAEDICS, LLC, d/b/a The Romano | ) |
| Orthopaedics Center; and | ) The Honorable |
| VHS WEST SUBURBAN MEDICAL CENTER, INC. | ) Catherine Schneider, |
| d/b/a West Suburban Medical Center, | ) Judge Presiding. |
| | ) |
| Defendants. | ) |
| | ) |
| (VHS West Suburban Medical Center, Inc., d/b/a West | ) |
| Suburban Medical Center, Defendant-Appellee). | ) |

JUSTICE TAILOR delivered the judgment of the court, with opinion.
Presiding Justice Oden Johnson and Justice Hyman concurred in the judgment and
opinion.

**OPINION**

¶ 1    In the competition for healthcare market share, hospitals today promote themselves to the

public as centers for comprehensive medical care with teams of highly competent and

compassionate physicians and ancillary care providers. But in order to limit their liability, hospitals employ few, if any, physicians. In the medical malpractice context, our apparent agency case law largely involves physicians who provide treatment to patients who have been admitted to the hospital, and in that instance courts have held that a disclaimer form signed by a patient acknowledging that the physician is an independent contractor and not employed by the hospital generally forecloses a malpractice claim against the hospital under apparent agency theory. In this instance, the patient was treated in a medical professional building located within the hospital medical complex but was neither asked to acknowledge in writing nor otherwise informed that her treating physician was not employed by the hospital. Based on the evidence in the record, we see no theoretical or pragmatic difference in our approach here than in cases involving treatment by physicians in the hospital in-patient setting. For the reasons we explain below, we find that the circuit court erred in dismissing the claim against the hospital as the apparent agent of the physician and reverse and remand for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3     This appeal arises out of the dismissal of a medical malpractice claim against a hospital as the apparent agent of a physician. Shaina Solorzano brought a medical malpractice suit against Dr. Victor Romano, VHS West Suburban Medical Center, Inc. (WSMC), and others, alleging that their failure to timely diagnose a cancerous tumor in her right leg resulted in the amputation of her leg from the pelvis down. In her complaint, Solorzano alleged that WSMC was vicariously liable for Dr. Romano's conduct. WSMC denied Solorzano's allegations and moved for summary judgment under section 2-1005 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1005 (West 2022)), which the circuit court granted. The following facts, which are not in dispute, were considered by the circuit court when it ruled on WSMC's motion.

¶ 4       In June 2015, Solorzano was involved in a car accident in Odessa, Texas. Both of her femurs were broken, and surgery was performed to insert rods and screws in each of her legs. When Solorzano returned to Illinois several months later, she went to see her primary care provider at PCC South (PCC) in Berwyn, Illinois, who referred her to see Dr. Jason Magnani, an orthopedic surgeon, at Mount Sinai Hospital. Dr. Magnani advised her that her bone was growing well.

¶ 5       In August 2016, Solorzano returned to see her primary care provider at PCC after she began experiencing pain and swelling above her right knee. Solorzano said that her primary care provider referred her to "orthopedics at [WSMC]" because PCC is affiliated with WSMC, and that she went to see Dr. Romano because that is where her primary care provider told her to go. The referral order from Solorzano's primary care physician stated the following:

> "Victor M. Romano, MD
>
> Victor Romano, MD
>
> West Suburban Hospital
>
> 1 Erie Court, Suite 7120
>
> Oak Park, IL 60302"

¶ 6       Solorzano acknowledged that she would have gone to whatever hospital and doctor her primary care physician recommended. She said that if her primary care physician had directed her back to Dr. Magnani at Mount Sinai Hospital, she would have gone to see him again.

¶ 7       WSMC's website states:

> "At WSMC, our mission is to improve the quality of life for every patient who enters our doors. *** For more than 100 years, our patients have our caring nurses and compassionate physicians to keep them well and see them through their health

3

challenges. With comprehensive services ranging from Bariatric Surgery to ***

Orthopedics *** and more—we are here for our neighbors in Oak Park and beyond."

WSMC's website says the following about its orthopedics department:

"Your life doesn't need to be put on hold if you're experiencing pain from a knee, hip, or

other joint. When conservative measures like diet, exercise, and medication can no longer

alleviate your pain, the orthopedic specialists at WSMC may be able to help. With vast

experience diagnosing and treating injuries and disease involving bones, joints,

ligaments, tendons, and nerves, our team works to create a high-quality program tailored

to you."

¶ 8       On August 26, 2016, Solorzano went to WSMC for an X-ray, which was interpreted by a

radiologist. The X-ray revealed a lytic lesion, the "destruction of an area of bone due to a disease

process, such as cancer," on the femur.

¶ 9       On August 29, 2016, Solorzano saw Dr. Romano for the first time. Dr. Romano is the

manager of and is employed by Romano Orthopaedics, LLC (Romano Orthopaedics). He is not

and has never been employed by WSMC. He has a WSMC badge, but he does not wear the

badge. Nor does he wear a lab coat bearing the WSMC logo. If his patients ask, he informs them

he is not employed by WSMC, but he does not routinely make a disclaimer about his

employment status. Dr. Romano's office is located on the seventh floor of WSMC's professional

building. The WSMC professional building adjoins and serves as the main entrance to the

hospital that WSMC owns and operates. Dr. Romano has had an office in the professional

building since 1992, and over the years he has held a number of positions at the hospital,

including chairman of the department of orthopedics, as well as president, vice president, and

president emeritus of WSMC's medical staff.

¶ 10      When Solorzano walked into WSMC's professional building, she saw several large signs identifying it as WSMC. When she arrived at Dr. Romano's office, she was given a consent form, which she signed. The consent form states at the top "ROMANO ORTHOPAEDICS, LLC—1 ERIE CT SUITE 7120 - OAK PARK IL 60302 - 708-848-4662." The form states the following:

> "CONSENT FOR TREATMENT: I hereby voluntarily consent to care, treatment, testing and all other services performed by healthcare providers at Romano Orthopaedics, LLC. At the same time, I do understand that I have the right to refuse consent to any proposed care, treatment, testing, surgery or procedure. Moreover, I have the right to ask questions and discuss my concerns with my healthcare provider. I acknowledge that no guarantees have been made to me as to the outcome of my care, examination and/or treatment at Romano Orthopaedics. While I understand that I am required to sign this consent annually or as necessary, I may revoke this consent at any time by writing to Romano Orthopaedics, LLC-1 Erie Ct Suite 7120 Oak Park, IL 60302 Attn: Practice Manager.
>
> RELEASE OF INFORMATION/ASSIGNMENT OF BENEFITS: I understand that Romano Orthopaedics shall maintain both electronic and paper-based documentation of the medical record. *** I am aware that data and information concerning medical treatment and healthcare services rendered on my behalf may be released, when necessary to healthcare providers in emergency situations and/or to public and private health insurance plans in order to receive payment for services provided by Romano Orthopaedics, LLC. I do hereby assign my benefits payable from my insurance plan to

Romano Orthopaedics, LLC and I authorize payment directly to them. I agree that this assignment cannot be revoked without Romano Orthopaedics, LLC consent."

The consent form says nothing about Dr. Romano's employment status or about the relationship between Romano Orthopaedics and WSMC.

¶ 11    During the August 29, 2016, appointment, Solorzano told Dr. Romano about the pain and swelling in her right leg. Dr. Romano examined her and reviewed her X-ray, which had been taken at WSMC. He acknowledged that the findings on the X-ray were indicative of a radiographic abnormality consistent with a tumor, but disagreed with the radiologist's finding of bony destruction or a lytic lesion. Instead, he believed Solorzano's pain was caused by incomplete healing or infection related to her prior surgery, so he ordered a magnetic resonance imaging (MRI) study to obtain additional information. He told Solorzano they would discuss the results of the MRI at her next visit.

¶ 12    Solorzano underwent an MRI study on September 27, 2016, at WSMC. The radiologist who read the MRI stated that the "[d]ifferential includes chronic osteomyelitis, possible foreign body reaction to metal, and a sarcoma." Solorzano went back to see Dr. Romano on September 29, 2016. Dr. Romano reviewed the results of Solorzano's MRI but did not believe that there was any osteosarcoma, which is a type of bone cancer, and instead thought the findings were indicative of a "healing fracture." He recommended that Solorzano undergo a screw removal procedure and discussed the surgery with her. Because Solorzano's insurance was set to expire at the end of the month, she said she would contact Dr. Romano's office to schedule the surgery once she found new insurance.

¶ 13    However, Solorzano did not return to Dr. Romano for the surgery or seek any additional medical care from him because he was no longer "in-network" with her new insurance provider.

In 2017, she sought additional treatment for her leg from a different provider, and then, on May 4, 2017, she was diagnosed with osteosarcoma in her right femur. Her right leg was amputated from the pelvis down shortly thereafter.

¶ 14    On February 25, 2022, after reviewing the evidence and hearing argument from the parties, the court granted summary judgment in favor of WMSC, stating: "WSMC maintains [Solorzano] has not presented any evidence to show the hospital held out as the care provider or that [Solorzano] justifiably relied on the hospital's conduct to provide the care. The court agrees." The court added,

> "[Solorzano] has not provided any evidence of [WSMC's] conduct that suggested to [her] the individual doctors were agents. [Solorzano] also testified she could not recall any badge or insignia on Dr. Romano's lab coat. Thus, based on the record, the court cannot find [WSMC] engaged in any conduct upon which a reasonable jury could infer the hospital 'held out' Dr. Romano as its employee."

The court also concluded that Solorzano "has not presented any evidence of the hospital's conduct upon which she relied to provide the care." It added, "Significantly, [Solorzano] testified that she 'would have gone to whatever hospital [her] physician at PCC recommended for [her].' She also testified that if PCC had told [her] instead to go back to Mt. Sinai and see [a different doctor], she would have gone back to him instead." The court added that although Solorzano submitted a screenshot of a hospital webpage listing Dr. Romano, she did not "submit[ ] any evidence of having viewed the webpage before the first appointment with Dr. Romano" and, therefore, "the screen shot does not indicate [Solorzano's] reliance."

¶ 15    On Solorzano's motion to reconsider, the court noted that Solorzano signed a consent form provided by Romano Orthopaedics on her first visit with Dr. Romano, not one provided by

7

WSMC. It also noted that Dr. Romano held certain leadership positions with WSMC and that he has a badge with the WSMC logo on it but had "never worn the badge on his person." The court conceded that it erred when it previously concluded that Solorzano would have had to have seen the hospital website in order to satisfy the holding out factor, noting that "[w]hether a patient actually observes a hospital's advertisements is not relevant to the objective inquiry into the holding out factor." However, the court concluded that even if "the hospital's website and the badge create a question of fact regarding the 'holding out' element, Solorzano still ha[d] not raised a question of fact regarding the 'justifiable reliance' element." The court stated that,

> "the record indicates that [Solorzano] did not rely on the hospital to seek care from Dr. Romano. [Solorzano] testified she went to see Dr. Romano because her primary care provider gave her a referral. *** Though [Solorzano] insists the primary care provider's referral was generally for the orthopedics department, the referral order specifies Dr. Romano by name. And while the referral order listed Dr. Romano's office address as [WSMC], [Solorzano] still sought care from a specific physician and not from the department of orthopedics generally. [Solorzano] scheduled an appointment with Dr. Romano rather than, for instance, seeking the next available orthopedic surgeon at [WSMC]. Put different, Dr. Romano was not chosen by [WSMC] to provide care to [Solorzano]. Accordingly, [Solorzano] has failed to present any evidence of 'justifiable reliance.' Because [Solorzano] has not established the 'justifiable reliance' element, she has not created a triable issue of fact as to the issue of apparent agency."

The court denied Solorzano's motion to reconsider on June 30, 2022.

¶ 16    On July 11, 2022, the court ruled that, pursuant to Illinios Supreme Court Rule 304(a) (eff. Mar. 8, 2016), its February 25, 2022, order was a final judgment as to WSMC, and that there was "no just reason to delay either enforcement or appeal or both."

¶ 17                                    II. ANALYSIS

¶ 18    We have jurisdiction over this appeal under Rule 304(a), which permits an appeal to be taken from a final judgment "as to one or more but fewer than all of the parties or claims only if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both." *Id.* The trial court made such a finding here, and Solorzano timely appealed.

¶ 19    As an initial matter, we note that WSMC filed a motion to strike portions of the "improper argument" in the statement of facts section of Solorzano's brief as well as certain pages of her attached appendix, which WSMC contends violate Illinois Supreme Court Rule 341 (eff. Oct. 1, 2020) and Rule 342 (eff. Oct. 1, 2019). We decline to strike any portion of Solorzano's brief or appendix and instead will "simply disregard" any portions of the brief and appendix we find to be in violation of the rules. *In re Marriage of Milne*, 2018 IL App (2d) 180091, ¶ 22, n.4.

¶ 20    The sole issue in this case is whether the trial court properly granted summary judgment to WSMC on the basis that it could not be held liable under the doctrine of apparent authority. Under section 2-1005 (c) of the Code (735 ILCS 5/2-1005(c) (West 2022)), summary judgment is properly granted when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." To determine whether a genuine issue of material fact exists, the court must construe the facts strictly against the moving party and

9

liberally in favor of the nonmoving party. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 518 (1993). "A triable issue exists where there is a dispute as to material facts or, when the facts are not in dispute, where reasonable persons might differ in drawing inferences from those facts." *Scardina v. Alexian Brothers Medical Center*, 308 Ill. App. 3d 359, 363 (1999). Because summary judgment is a "drastic means to dispose of litigation," it should be granted only where "the movant's right is clear and free from doubt." *Prutton v. Baumgart*, 2020 IL App (2d) 190346, ¶ 22. We review the trial court's grant of summary judgment *de novo. Williams v. Tissier*, 2019 IL App (5th) 180046, ¶ 25.

¶ 21    A hospital can be held "vicariously liable for the negligent acts of a physician providing care at the hospital, regardless of whether the physician is an independent contractor, unless the patient knows, or should have known, that the physician is an independent contractor." *Gilbert*, 156 Ill. 2d at 524. For a hospital to be liable under the doctrine of apparent authority, a plaintiff must show that:

> " '(1) the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital; (2) where the acts of the agent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in them; and (3) the plaintiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence.' " *Id.* at 525 (quoting *Pamperin v. Trinity Memorial Hospital*, 423 N.W.2d 848, 855-56 (Wis. 1988)).

"To survive a defendant hospital's motion for summary judgment on a claim of apparent agency, a plaintiff must present at least some evidence to satisfy each of the *Gilbert* factors." *Lamb-Rosenfeldt v. Burke Medical Group, Ltd.*, 2012 IL App (1st) 101558, ¶ 25.

¶ 22        A. A Genuine Issue of Material Fact Exists on the "Holding Out" Element

¶ 23    Solorzano asserts that either Dr. Romano's or WSMC's actions would lead a reasonable person to conclude that Dr. Romano worked for WSMC because the hospital's website promoted its physicians and its orthopedics department, Dr. Romano's office was located on WSMC's campus, Dr. Romano was issued a WSMC badge and held a number of leadership positions at the hospital, and neither Dr. Romano nor the consent form he presented to Solorzano expressly disclaimed an employment relationship with WSMC.

¶ 24    "The first two *Gilbert* elements are frequently grouped together and have been referred to as the 'holding out' factor." *Id.* ¶ 26. The focus of the "holding out" element is whether "the patient knows, *or should have known*, that the physician is an independent contractor." (Emphasis added.) *Gilbert*, 156 Ill. 2d at 524. This is not a subjective test; instead, a hospital will prevail on the "holding out" element if "the patient is in some manner put on notice of the independent status of the professionals with whom he might be expected to come into contact." (Internal quotation marks omitted.) *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 182 (2006); *Wallace v. Alexian Brothers Medical Center*, 389 Ill. App. 3d 1081, 1087 (2009) (as long as a patient is "placed on notice of the independent contractor status of [her] doctors, 'it would be unreasonable' for her to assume that they were employed by [the hospital] and, thus, she could not sustain an apparent agency claim against [the hospital]"). However, "no requirement exists that a plaintiff must make a direct inquiry into the status of physicians working in a hospital. Instead, the burden is on hospitals to put their patients on notice of the independent status of the professionals with whom the patients might be expected to come in contact." *Kane v. Doctors Hospital*, 302 Ill. App. 3d 755, 762 (1999).

¶ 25     To determine whether a hospital held a physician out as its agent, courts consider a number of factors, including whether the hospital's advertising creates the appearance of an agency relationship. See, *e.g.*, *McCorry v. Evangelical Hospitals Corp.*, 331 Ill. App. 3d 668, 671-72 (2002) (finding that the evidence could support a finding that the hospital held itself out as the principal for its agents when the hospital's advertisements said that its staff included hundreds of "highly qualified physicians" and referred to them as " 'our physicians' "); *Prutton*, 2020 IL App (2d) 190346, ¶¶ 12, 48 (finding that the hospital's website, which displayed a doctor's photo and said she " 'recently joined the medical staff' " "could, *if viewed in isolation*, create a question of material fact as to whether there was an employer-employee relationship between the hospital and [the doctor]" (emphasis in original)). It does not matter whether the patient ever saw these advertisements or not; the inquiry is an objective one. See, *e.g.*, *Yarbrough v. Northwestern Memorial Hospital*, 2016 IL App (1st) 141585, ¶ 57 ("Whether a patient actually observes a hospital's advertisements is not relevant to the objective inquiry into the 'holding out' factor under *Gilbert*."), *rev'd on other grounds*, 2017 IL 121367.

¶ 26     Here, the record establishes a genuine issue of material fact on the "holding out" element. On its website, WSMC held itself out as the principal for its physicians because it referred to the "orthopedic specialists at WSMC" as "our team" and "our *** compassionate physicians" and included no disclaimers about its relationship with them. Although WSMC argues on appeal that the website evidence was obtained from The Wayback Machine (a digital archive of the World Wide Web) and lacks foundation, it forfeited that argument by not objecting to it in the trial court. See *People v. Johnson*, 238 Ill. 2d 478, 484 (2010) (where a party "fails to object to an error at trial *** he forfeits ordinary appellate review of that error."). The fact that WSMC issued a badge to Dr. Romano, even if he never wore it, and the fact that Dr. Romano held a number of

leadership positions at the hospital over the years, including most notably as chairman of WSMC's orthopedics department and president of WSMC's medical staff, also support Solorzano's argument that WSMC held Dr. Romano out as its agent. Indeed, given his position as president of WSMC's medical staff, one may be hard-pressed to find a physician who is a greater personification of WSMC than Dr. Romano. See *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶ 31 (considering doctor's status as chief of staff at the hospital when assessing the "holding out" element).

¶ 27 Another factor courts consider when analyzing the "holding out" element is whether the patient signed a consent to treatment form containing independent contractor language. When the language in the consent forms is clear and unambiguous, courts have found them "almost conclusive" in determining whether a hospital can be held liable for the medical negligence of its independent contractor physicians. *Steele v. Provena Hospitals*, 2013 IL App (3d) 110374, ¶ 131; see *Williams*, 2019 IL App (5th) 180046, ¶ 33 (whether a consent form contains an unambiguous "independent contractor" disclaimer is an "important fact to consider in evaluating the 'holding out' element").

¶ 28 However, when hospital consent forms fail to inform patients that doctors are not hospital employees, or the language in the consent forms is ambiguous, courts have found them insufficient to defeat "holding out" claims. In *Butkiewicz v. Loyola University Medical Center*, 311 Ill. App. 3d 508, 512 (2000), for example, the court found that the plaintiff satisfied the "holding out" element because "[n]othing would have alerted [the patient] to the fact that [the radiologist] was not a hospital employee" because the radiologist's only office address was at the hospital, the reports he authored were on hospital letterhead and "[t]here was no written notice on admittance or consent forms that the doctors were not hospital employees nor were signs to

13

that effect posted on the hospital property." See *McCorry*, 331 Ill. App. 3d at 672 (noting that the hospital's consent form included no indication that Christ Hospital did not employ its surgeons and physicians and concluding that "[n]othing in *** the forms the hospital presented to plaintiffs showed that [the doctor] did not act as the hospital's agent").

¶ 29 Here, the consent form Solorzano signed when she arrived at Dr. Romano's office states at the top "ROMANO ORTHOPAEDICS, LLC-1 ERIE CT. SUITE 7120-OAK PARK, IL 60302-807-848-4662." The "consent for treatment" section states, "I hereby voluntarily consent to care, treatment, testing and all other services performed by healthcare providers at Romano Orthopaedics, LLC. *** I acknowledge that no guarantees have been made to me as to the outcome of my care, examination, and/or treatment at Romano Orthopaedics. *** I may revoke this consent at any time by writing to Romano Orthopaedics, LLC." The form also states, "I hereby assign my benefits payable from my insurance plan to Romano Orthopaedics, LLC, and I authorize payment directly to them." Solorzano concedes that she read the consent form and signed it, but argues that the form was inadequate to put her on notice that Dr. Romano was not a hospital employee because "[t]here is no disclaimer of agency with or employment by WSMC" and the consent form "did not inform [her] that Dr. Romano was an independent contractor of WSMC." WSMC argues in response that Solorzano should have known that the care she received when she saw Dr. Romano was provided by employees of Romano Orthopaedics based on the consent form she signed and that there was no reason for the form to mention WSMC because Solorzano was receiving medical care at Romano Orthopaedics, not WSMC.

¶ 30 We are not persuaded by WSMC's argument. Although the consent form states that treatment would be "provided by healthcare providers at Romano Orthopaedics, LLC," it notably does not state who employs these healthcare providers or expressly disclaim any employment

relationship with WSMC. We also question whether an average consumer would understand that an "LLC" is an acronym for limited liability company and that an LLC is a legal entity similar to a corporation through which business is conducted. While the employment relationship may be obvious to Dr. Romano and WSMC, patients like Solorzano are entitled to disclosure of essential facts about the relationship between their healthcare providers and should not be left to speculate about corporate ownership structures and employment relationships. For these reasons, we find that the consent form Solorzano signed was at least ambiguous and thus cannot defeat her "holding out" claim. When we consider the evidence presented, including WSMC's advertisements; the WSMC badge issued to Dr. Romano; the number of senior levels positions Dr. Romano held at the hospital over the years, including chairman of the WSMC's orthopedics department and president of its medical staff; the referral form Solorzano received from PCC (who Solorzano believed was affiliated with WSMC) stating that Dr. Romano's office address was "West Suburban Hospital"; Dr. Romano's office was located inside the WSMC professional building; the professional building is in the same physical structure as the hospital; the entrance Solorzano used to access Dr. Romano's office was also the entrance to the hospital; the professional building contains WSMC signs but none of them inform patients that physicians like Dr. Romano who work there are independent contractors; and Dr. Romano did not tell Solorzano that he was not employed by WSMC, we conclude that it was sufficient to create a genuine issue of material fact as to the "holding out" element of the *Gilbert* test. *Cf. Prutton*, 2020 IL App (2d) 190346, ¶ 55 (concluding that the signed consent forms, which "clearly and unambiguously informed plaintiff that the physicians at the hospital *** were independent contractors," were sufficient to defeat the plaintiff's "holding out" argument despite the fact that the hospital's advertisements "initially could have been seen to create a genuine question of

material fact on the issue of whether [the hospital] held [the doctor] out as an employee or agent").

¶ 31       B. A Genuine Issue of Material Fact Exists on the Justifiable Reliance Element

¶ 32     To meet the justifiable reliance element, a plaintiff must establish that she " 'acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence.' " *Gilbert*, 156 Ill. 2d at 525 (quoting *Pamperin*, 423 N.W.2d at 855-56). A plaintiff may satisfy the reliance element if she can show that she relied upon the hospital, rather than a specific physician, to provide medical care. *Williams*, 2019 IL App (5th) 180046, ¶ 54; see *York*, 222 Ill. 2d at 193 (noting that the "critical distinction is whether the patient relied upon the *hospital* for the provision of care or, rather, upon the services of a particular physician" (emphasis in original)). "[O]ne must consider whether the patient in a sense placed himself in the 'hands' of the hospital and looked to it to furnish the medical personnel, including doctors, essential for treatment." *Scardina*, 308 Ill. App. 3d at 365.

¶ 33     In *Scardina*, this court reversed the trial court's grant of summary judgment to the hospital after finding that the evidence was sufficient to raise a triable issue of fact regarding the plaintiff's justifiable reliance. *Id.* at 368. The evidence showed that the plaintiff went to Alexian Brothers Hospital at the direction of his family physician, was not given a choice of hospitals to visit, never met with the doctor charged with allegedly negligent conduct before arriving at the hospital, did not select this particular doctor to provide his treatment, and believed the doctor was a hospital employee because the doctor never disclosed his employment status with the hospital to him. *Id.* at 362. The court noted that "a showing that the plaintiff would have *** gone to a different hospital, had he been aware of the status of his treating physician as an independent contractor is not necessary to satisfy the reliance element," and reasoned that the

"mere fact" that plaintiff was directed to the hospital by his family physician did not establish that he did not rely upon the hospital to provide his care. *Id.* at 366-67.

¶ 34    Similarly here, we find that genuine issues of material fact exist regarding whether Solorzano justifiably relied on WSMC to provide her with orthopedic services as opposed to Dr. Romano or his employer, Romano Orthopaedics. Solorzano testified that she was referred "to orthopedics at [WSMC]" and that she went to see Dr. Romano because her primary care provider referred her to him. Solorzano said she "did not know of Dr. Victor Romano or Romano Orthopaedics" before she went to see him in August 2016, that she "did not specifically select Dr. Romano as a care provider," and that she "assumed that Dr. Romano was an employee of the hospital." Similarly, Dr. Romano testified that Solorzano came to him "out of the blue." Solorzano said she would have gone to whatever doctor or hospital her primary care provider referred her to. She further averred in her affidavit that she relied on WSMC for her medical treatment. Based on the record before us, a reasonable fact finder could conclude that Dr. Romano was selected for Solorzano by PCC—who Solorzano understood was an affiliate of WSMC—because he was in WSMC's network of physicians, not that Solorzano selected Dr. Romano to treat her. For this reason, Solorzano's case is distinguishable from those where patients followed their personal physicians to specific hospitals for follow-up care. See, *e.g.*, *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶¶ 33-35 (finding that the patient relied on a specific physician, not the hospital, to provide her medical care, where testimony established that the patient had a preexisting relationship with her doctor and had seen her doctor several times at the doctor's office prior to her hospital visit, and the hospital "was merely the location from which [the patient] received continued services from [her doctor]").

¶ 35    "[T]he relevant inquiry with respect to the reliance element is not whether the plaintiff reported to the hospital at the direction of another person but, rather, whether the plaintiff looked to the hospital to furnish all that is essential for treatment, including supporting medical personnel." *York*, 222 Ill. 2d at 191. Solorzano received a referral from her primary care provider, PCC, for an "Orthopedic Consult" with "Victor Romano, MD[,]" which stated his office was at "West Suburban Hospital[.]" Solorzano averred in her affidavit that she understood at the time that PCC was affiliated with WSMC, and there is no evidence in the record indicating that PCC and WSMC are not affiliated entities. Solorzano had previously gone to WSMC for physical therapy based on a referral order she believed came from PCC. PCC's order also referred Solorzano to WSMC for an X-ray study, which was performed at WSMC. When Solorzano went to see Dr. Romano, she entered through WSMC's main entrance to get to his office. No signs or disclaimers from WSMC, Dr. Romano, or his staff put Solorzano on notice that Dr. Romano was not a hospital employee. After this visit, Solorzano had an MRI study performed at WSMC, pursuant to Dr. Romano's referral order. Then she went to her second appointment at Dr. Romano's office within the WSMC medical complex. After Solorzano received her X-rays and an MRI as WSMC, those radiological study results were sent directly to Dr. Romano without any action on Solorzano's part, additional indicia that Solorzano justifiably relied on WSMC for her medical care.

¶ 36    The physical therapy, X-ray study, MRI study, and orthopedic care were all provided to Solorzano at WSMC's medical campus, making Solorzano's "snow globe" analogy a particularly apt device to explain why a fact finder could reasonably conclude that Solorzano relied on WSMC for her medical treatment. In Solorzano's depiction, the snow globe represents the WSMC health care system, the figurines inside the globe represent the physicians and health care

providers associated with the WSMC health care system, and the snowflakes represent the patients being treated by the WSMC health care system. All of Solorzano's medical care providers were within the WSMC snow globe, consistent with a comprehensive medical care provider business model. Solorzano went from one health care provider to another health care provider within the WSMC health system. Yet, like a muted figurine in the snow globe, Dr. Romano, who referred Solorzano to other specialists and treatment providers within the WSMC health care system, did not inform her that he was not employed by WSMC. A reasonable fact finder could conclude under these circumstances that Solorzano relied on WSMC for her health care, not Dr. Romano.

¶ 37     WSMC, however, argues that Solorzano's reliance is defeated by the fact that she said she did not understand the relationship between Dr. Romano and WSMC. In the WSMC "snow globe" that she found herself in, we are not surprised that Solorzano lacked this understanding. As Dr. Romano testified in his deposition, he would only tell a patient that he was not employed by WSMC if he was specifically asked, and the consent form Solorzano signed said nothing about Dr. Romano's relationship with WSMC. Therefore, Solorzano's statement—that she did not understand the relationship between Dr. Romano and WSMC—is not necessarily inconsistent with her testimony that she assumed that Dr. Romano was employed by WSMC and relied on WSMC for her care. WSMC then argues that Solorzano's statement in her affidavit that she relied on WSMC for her care is self-serving, but what party affiant does not provide self-serving evidence. *See Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("Deposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving. [Citation.] As we have repeatedly emphasized over the past decade, the term 'selfserving' must not be used to denigrate perfectly admissible evidence through which a party

tries to present its side of the story at summary judgment."). Finally, WSMC makes much ado about Dr. Romano's office being located at 1 Erie Court and the hospital being located at 3 Erie Court. However, WSMC's website directed visitors to "expert orthopedic care" at "3 Erie Court," the address of the hospital. Moreover, because the professional offices and the hospital are located in the same building or adjoining buildings (the record is not clear on this point) and are accessed through a shared main entrance, we are at a loss to see how Solorzano's reliance argument is defeated by the difference in addresses.

¶ 38   Taken together, we find that a genuine issue of material fact exists as to whether Solorzano justifiably relied upon WSMC, not Dr. Romano or Romano Orthopaedics, to provide her with healthcare. We therefore conclude that the trial court's grant of summary judgment was error.

¶ 39                                    III. CONCLUSION

¶ 40   For the foregoing reasons, the circuit court's grant of summary judgment to WSMC is reversed and this case is remanded for further proceedings consistent with our decision.

¶ 41   Reversed and remanded.

***Solorzano v. Magnani*, 2024 IL App (1st) 221169**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2018-L-6332; the Hon. Catherine Schneider, Judge, presiding. |
| **Attorneys for Appellant:** | Michael Murphy Tannen and Timothy Ryan Meloy, of Tannen Law Group, P.C., and John G. Kelly and Greg R. Ignoffo, of Kelly & Ignoffo Law Group, P.C., both of Chicago, for appellant. |
| **Attorneys for Appellee:** | Michael Resis, Ellen L. Green, and Jennifer K. Stuart, of Amundsen Davis, LLC, of Chicago, for appellee. |